## UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

———————————————

UNITED STATES OF AMERICA,

Plaintiff,

v.

DONTE MCKINLEY HOLLISTER,

Defendant.

———————————————

CASE NO. 12-CR-13 (PJS/TNL)

**REPORT & RECOMMENDATION**

Kevin S. Ueland, Assistant United States Attorney, **UNITED STATES ATTORNEY'S OFFICE**, 300 South Fourth Street, Suite 600, Minneapolis, MN 55415, for Plaintiff ; and

Caroline Durham, Public Defender or Community Defender Appointment, **OFFICE OF THE FEDERAL DEFENDER**, 300 South 4th Street, Suite 107, Minneapolis, MN 55415, for Defendant.

## I.

This matter is before the Court, United States Magistrate Judge Tony N. Leung, on Defendant's Motions to Suppress Evidence Obtained as a Result of Search and Seizure (Docket Nos. 19, 38); Defendant's Motions to Suppress Statements, Admissions, and Answers (Docket Nos. 20, 39); and Defendant's Motions to Suppress Eyewitness Identifications (Docket Nos. 24, 37). These matters have been referred to this Court for report and recommendation.

1

On May 29, 2012, a hearing was held on the motions. Assistant United States Attorney Kevin Ueland appeared on behalf of the United States of America (the Government).   Caroline Durham appeared on behalf of Defendant Donte McKinley Hollister.   The Court heard testimony from police officers Matt Reilly, Thomas Gray, Denny Arons, David Hall, Steven Thomas, and Ryan Matthew.   The following Government Exhibits were offered and received: Exhibits 1, 3, and 4 are search warrants and supporting documents; Exhibit 2 is a completed consent-to-search form; Exhibit 5 is a DVD video recording of an interview with Defendant; Exhibit 6 is a CD  audio recording of an interview with Defendant; Exhibits 7, 8, 9, and 10 are sequential photo lineups; Exhibits 10A and 10B are signed and dated photographs from a sequential photo lineup; and Exhibits 11A, 11B, and 11C are surveillance photographs.

## II.

Based upon the file and documents contained therein, along with testimony and exhibits presented at hearing, the undersigned Magistrate Judge makes the following:

### FINDINGS

1. **Eyewitness Identifications**

   a. **October 19, 2011 Lineup**

Detective Sergeant Denny Arons of the Golden Valley Police Department investigated a robbery that occurred on September 26, 2011, at a retail business, Way to Go Sports.  Tr. 59:22-60:7.  Detective Arons described the circumstances of the robbery as follows:

> [I]n the evening about 6:30ish, 6:45, a lone, black male came into the store and engaged in conversation with the clerk and actually some other customers about used hockey equipment. And a number of minutes went by, maybe somewhere in the area of 15, 20 minutes. And finally, the last shopper in the store left, at which time the lone black male displayed a gun and committed a robbery.

Tr. 66:13-21. Detective Arons testified that the victim-clerk (Victim-Clerk I) described the suspect as a black male with a slight mustache, possibly slight chin hair, and a tattoo on the side of his neck. Tr. 67:3-5, 68:9-12.  Victim-Clerk I also described the suspect as five feet eight or nine inches tall and weighing 170 pounds. Tr. 67:3-5, 68:9-12.  Victim-Clerk I reported that the suspect was texting on his cellular telephone.  Tr. 67:8-18.

Detective Arons testified that he has training and experience in administering sequential photo lineups. Tr. 58:13-24.  Detective Arons testified that the general process for assembling a sequential photo lineup is as follows:  First, an officer identifies a current photograph of the suspect using a database such as the Minnesota Repository of Photographs for the Hennepin County Booking Repository or the Department of Corrections' inmate pictures. Tr. 59:2-7.  Second, the officer finds photographs of people who have the same appearance or look similar to the suspect. Tr. 59:8-14.  Finally, Detective Arons "would have six separate photographs, one photograph on each page. [He] would hand the witness the six photographs, let them look at the photographs, and they could report back . . . on what their findings are." Tr. 59:17-21.

As part of his investigation Detective Arons showed a sequential photo lineup to Victim-Clerk I.  Tr. 60:9-12.  The sequential photo lineup that Detective Arons used in the present case is an eight-page document, which is Government Exhibit 9.  The first

page is a "Photo Identification Report." The second page is a list of names and birthdates that correspond with a number. Tr. 61:4-7. The remaining six pages are each a photograph of a different individual with a corresponding number. For example, Photograph #4 is of Defendant. Tr. 62:13-17. The Court notes that Government Exhibit 9 contains six photographs of black males who all have generally short hair, dark eyes, and close-shaven goatee facial hair. Detective Arons testified that he found the picture of Defendant on the Department of Corrections' website, Tr. 62:5-10, and his staff assembled the remainder of the lineup. Tr. 61:9-12, 62:18-22. Detective Arons then reviewed the lineup. Tr. 62:21-63:19.

On October 19, 2011, at 1:31 p.m., Detective Arons administered a sequential photo lineup to Victim-Clerk I, who was on duty at the store. Tr. 63:22-24. Detective Arons testified that he read the instructions on the "Photo Identification Report" page to Victim-Clerk I. Tr. 63:25-64:16. Detective Arons testified that he "handed [Victim-Clerk I] six individual pieces of paper, each one with the same six pictures," told Victim-Clerk I to look through the pictures, and permitted him to go through the pictures at his own speed. Tr. 64:17-25. Detective Arons testified that "[a]s [Victim-Clerk I] was looking through the photographs, he stopped at number 4 and he said, ['T]hat is the guy. [']" Tr. 65:13-19. Detective Arons instructed Victim-Clerk I to look through the remainder of the photographs before he made a judgment. Tr. 64:20-65:5. After Victim-Clerk I had looked at the other photographs, he stated that he was certain that Photograph #4 was the suspect. Tr. 66:6-8.

This was the second photo lineup administered to Victim-Clerk I. Tr. 70:14-20. Officer Ryan Matthew also conducted a sequential photo lineup with Victim-Clerk I on October 5, 2011. Tr. 124:10.  Victim-Clerk I identified someone, but stated that he was not "100 percent sure." Tr. 124:10-127:1.

### b.  October 26, 2011 Lineup

Investigator Matt Reilly with the St. Louis Park Police Department testified that he investigated a robbery that occurred on or about October 13, 2011, at a retail business, 2nd Wind. Tr. 15:17-24; *see also* Tr. 199:4 (referred to as "2nd Wind Exercise"). Investigator Reilly testified about the circumstance of the robbery as follows:  In the evening, a suspect entered the store and spoke with the clerk for approximately three minutes.  Tr. 16:5-11.  "As [the suspect] turned to leave, he got to the door, at which point he turned to [the clerk], pulled out a handgun, displayed it and then told [the clerk] to get on the floor." Tr. 16:11-13.  The clerk "was asked where the till was, where the money was." Tr. 16:15-16.  The clerk opened the till, which only had "a few dollars." Tr. 16:16-17.  "[T]he suspect said he wasn't going to take the money and he left." Tr. 16:17-18. The clerk described the suspect as an "African American or black male, approximately five-seven, medium build," with a tattoo on his neck. Tr. 23:22-24:5.

Investigator Reilly testified that he has training and experience administrating sequential photo lineups.  Tr. 14:21-15:10.  Investigator Reilly assembles photo lineups using the Hennepin County Sheriff's Office Arrest Photograph Database, but he could use a different database. Tr. 17:12-19, 30:3-8.  Investigator Reilly locates a booking photograph of the suspect from the database, and then enters parameters, such as height,

weight, race, and hair, which yields a series of photographs within those parameters. Tr. 18:21-19:4. Investigator Reilly picks five photographs that best match the suspect in terms of the parameters. Tr. 19:4-5. The first page of these lineups is the "master sheet," which contains all six photographs and the names of the people listed on the photographs. Tr. 19:10-15.  The other pages each consist of one photograph and a number, such that each individual on the master sheet has his or her own individual-page photograph and separate number.

In order to make the administration of lineups blind, Investigator Reilly uses six identical tan folders, which he numbers one through six. Tr. 20:2-7.  Investigator Reilly shuffles the individual-page photographs face down and blindly inserts each individual-page photograph into a separate tan folder.  Tr. 8-14.  This "blind" procedure means that Investigator Reilly does not know which photograph is in which folder and the number on the photograph may not correspond with the number on the folder.  Tr. 20:12-13, 20:22-25.  Thereafter, Investigator Reilly presents the closed tan folders to the witness and steps away.  Tr. 21:4-12.

In the present case, Investigator Reilly was provided with Defendant's name as a possible suspect. Tr. 18:10-16. Investigator Reilly assembled a seven-page sequential photo lineup, which is Government Exhibit 7.  Investigator Reilly used the following parameters to generate the sequential photo lineup: race, height, and build.  Tr. 26:19:24. This yielded several hundred photographs.  Tr. 26:15-18. Investigator Reilly testified that photograph #1, which is identified as Defendant on the master sheet, was in Folder #4. Tr. Tr. 22:20-23; Gov. Ex. 7. Investigator Reilly testified that he no longer possessed the

tan folders that were used in the lineup. Tr. 30:18-32:6.   This Court has reviewed Government Exhibit 7. The Court notes that photographs selected match the parameters used in their creation. Government Exhibit 7 is not the same sequential lineup as any of the other sequential lineups.

Investigator Reilly conducted two photo lineups with the 2nd Wind victim-clerk (Victim-Clerk II).   Tr. 24:18-25:8.   The second photo lineup occurred on October 26, 2011, when Investigator Reilly administered a sequential photo lineup to Victim-Clerk II at the 2nd Wind location.   Tr. 17:16-19, 18:7-9, 23:14-21.   Investigator Reilly told Victim-Clerk II, "You have six photographs. Don't pay attention to the numbers. Those are purely for tracking purposes. Six photographs, take your time. Look at all six, and tell me if there's any one in those six that you know." Tr. 21:13-21.   Investigator Reilly then stepped back 10 to 20 feet.   Tr. 33:5-34:4. Victim-Clerk II looked in each folder and looked at each photograph. Tr. 21:22-25.   Victim-Clerk II looked at the photographs between two to three minutes. Tr. 22:1-8. Investigator Reilly testified as follows: "[The victim-clerk] went through all folders once. He went through a couple of pictures a couple of times.  But, most of them he folded over, and then he took one folder and set it off to the side, closed." Tr. 9-14.  Victim-Clerk II identified the suspect as the individual in the photograph in Folder #4, which is labeled Photograph #1. Tr. 22:15-23.  Victim-Clerk II confirmed that he was "100 percent" certain of the identification.  Tr. 22:24-23:3.  Investigator Reilly testified that when Victim-Clerk II looked at the photograph in the fourth folder, Victim-Clerk II had a reaction "almost like he took a breath" or was surprised to see the individual in the photograph.   Tr. 23:7-13.

### c.   October 20, 2011 Surveillance Photographs

On October 20, 2011, Officer Matthew and other officers went to the residence of A.S., Defendant's girlfriend. Tr. 118:19-24. Defendant and A.S. had been romantically involved since July 2011 and A.S. was pregnant with Defendant's child. Tr. 117:24-118:5.   Defendant was no longer living with A.S. because she "kicked him out of the apartment" based on Defendant's reported infidelity. Tr. 118:3-5.   One of the officers showed A.S. surveillance photographs from the 2nd Wind robbery. Tr. 118:25-8.   The photographs shown to A.S. are Government's Exhibits 11A, 11B, and 11C. Officer Matthew testified that when A.S. was shown the surveillance photographs "she immediately broke down crying saying that was [Defendant]." Tr. 120:17-19.

### d.   October 27, 2011 Lineup

On October 7, 2011, Roseville Police Officer Thomas James Gray responded to an armed robbery call from a retail business, Mattress Giant. Tr. 39:9-23.   Officer Gray spoke to the victim-salesperson, who reported as follows:   That day, the victim-salesperson was approached by the suspect: a black male, with a thin build, short hair or a shaven head, wearing a black or dark hoodie and blue jeans. Tr. 40:21-24.   The victim-salesperson also noticed that the suspect who approached him had a neck tattoo that was in cursive writing and "said something like 'Danielle.'" Tr. 40:25-41:3.   The suspect inquired about purchasing a mattress. Tr. 40:13-20, 41:4-9.   After the victim-salesperson showed the suspect some mattresses, the suspect pushed him, brandished a gray handgun, and demanded money. Tr. 41:10-42:9.   After the suspect led the victim-salesperson throughout the store searching for money, the suspect attempted to get the victim-

8

salesperson to enter a storage room. Tr. 41:7-18.  The victim-salesperson pushed the man and ran from the store. Tr. 43:3-7.  The victim-salesperson saw the suspect also running from the store. Tr. 43:5-8.

Government Exhibit 8 is the sequential photo lineup shown to victim-salesperson. Tr. 43:14-18. The first page of Government Exhibit 8 is a "Witness Form," which includes handwritten information about the person who administered the lineup, the location of the identification, and witness being presented with the photo lineup. The second page is an "Administrator Form," which was completed by Officer Gray. The other six, separately numbered pages are photographs of individuals. This Court has reviewed Government Exhibit 8 and all of the photographs are of black males of medium build, with closely trimmed hair, dark or brown eyes, and close shaven goatee facial hair. *See* Gov't Ex. 8.  Defendant is in Photograph #3 and is wearing a blaze-orange shirt; another man is wearing a black shirt; two other men are wearing gray shirts; and two men are wearing white shirts.  Tr. 52:13-53:5. Officer Gray testified that orange is often the color that individuals wear in jail. Tr. 52:9-12.

On October 27, 2011, around 5:00 p.m., Officer Gray showed a sequential photo lineup to the victim-salesperson. Tr. 43:14-18.  Officer Gray testified that he has training in conducting sequential photo lineups.  Tr. 38:3-20.   The photo lineup was generated by an officer other than Officer Gray; therefore, Officer Gray did not know who was represented in the photo lineup. Tr. 44:24-45:10, 46:25-47:12.  Officer Gray later learned that the person in Photograph #3 was Defendant. Tr. 49:16-19.   The sequential photo lineup was conducted at the Mattress Giant location.  Tr. 45:13-21.  Prior to showing the

victim-salesperson the lineup, Officer Gray read the instructions on the first page of the Witness Form. Tr. 45:22-46:24.   The victim-salesperson initialed the section of the Witness Form that stated that he understood the instructions.  Tr. 47:13-20.  After reading the instructions, Officer Gray showed each photograph to the victim-salesperson, one photograph at a time. Tr. 48:8-14.  Officer Gray testified that he turned photos whenever the victim-salesperson indicated he was ready to move on. Tr. 48:8-14. The victim-salesperson looked at each photograph between five and ten seconds. Tr. 48:20-23. Officer Gray went through the lineup three times with the victim-salesperson. Tr. 48:24-49:1; 54:2-24.  The victim-salesperson identified Photograph #3 as the suspect.  Tr. 49:2-6. The victim-salesperson signed and dated the photograph, pursuant to the officer's training. Tr. 49:7-15; 55:15-25; Gov. Ex. 8. The victim-salesperson indicated to Officer Gray that he was absolutely certain. Tr. 49:20-23.  Officer Gray testified that "[a]s soon as [victim-salesperson] turned -- or I turned to number three, he began shaking and he started breathing a little heavier. And he appeared to be nervous." Tr. 50:8-12.

### e.  October 28 and November 16, 2011 Lineups

Patrol Officer David Hall of the Medina Police Department testified that he investigated a robbery that took place on September 27, 2011, at a retail business, WineStyles. Tr. 77:9-18.  As part of this investigation, he presented a sequential photo lineup to two witnesses of that robbery. Tr. 77:19-22.  Officer Hall testified that he has training and experience in administering sequential photo lineups. Tr. 75:20-25, 76:1-9.

Officer Hall did not prepare the sequential photo lineup that he presented to the two witnesses. Tr. 86:11-16; 78:16-19.   Officer Hall testified that an investigator

provided him with six photographs, which constitute Government Exhibit 10.  Tr. 78:16-22. This Court reviewed Government Exhibit 10. Government Exhibit 10 is identical to Government Exhibit 8 except that it does not include Witness or Administrator Forms and there are no markings on Defendant's photograph (i.e., Photograph #3).

On October 28, 2011, Officer Hall administered the photo lineup to the store-owner witness at WineStyles.   Tr. 79:5-17.   The store-owner witness previously identified the suspect as "[a]pproximately five-foot-nine, 160 pounds, African-American male with black hair and black clothing."  Tr. 82:9-16.  Officer Hall testified that prior to handing the store-owner witness the photographs, he told the store-owner witness that he was administering a photo lineup, "[e]ach picture [would] be viewed separately, one at a time, and if he needed to look at them again he could do so, but he would look at all six again.  And that the suspect may or may not be in the photographs and that the investigation would continue if he was not chosen." Tr. 79:25-80:6, 80:22.  Officer Hall testified that the store-owner witness looked at each photograph, one at a time, for approximately 10 seconds.  Tr. 80:16-25.  The store-owner witness went through the lineup twice. Tr. 81:1-3. The store-owner witness identified Photograph #3 as the person who committed the robbery. Tr. 81:4-8. The store-owner witness signed and dated Photograph #3. Tr. 81:12-22.  The photograph identified and signed by the store-owner witness is Government Exhibit 10A.  Tr. 81:12-22.

On November 16, 2011, Officer Hall administered the same photo lineup (i.e., Government Exhibit 10) to the customer-witness at the Medina Police Department. Tr. 82:17-83:15. The customer-witness "was in the store at the same time as the suspect just

prior to the robbery." Tr. 82:24-83:2. The customer-witness had previously described the suspect as "[a]pproximately five-foot-seven, African-American male wearing black clothing." Tr. 85:18-25. Officer Hall provided the customer-witness with the same instructions he provided the store-owner witness. Tr. 83:20-25. The customer-witness paged through the photographs, spending 10 to 15 seconds on each picture. Tr. 84:1-6. The customer-witness went through the photographs twice. Tr. 84:8-10. The customer-witness identified Photograph #3 as the suspect. Tr. 84:11-16. The photograph identified and signed by the customer-witness is Government Exhibit 10B. Tr. 84:20-85:17.

### 2.  Statements

#### a.  October 19, 2011 Interview

Government Exhibit 5 is a DVD containing a video-recorded interview with Defendant from October 19, 2011. The Court has watched the approximately 26-minute video recording.  The contents can be briefly summarized as follows:

The interview commenced at 9:53 p.m. The interview was conducted in the Golden Valley Police Department's interview room, which is a plain room with a single table surrounded by three chairs and two chairs along the wall.  The interview was conducted with "Detective Owens" of the Minnetonka Police Department, who was dressed in casual plain clothes, and by another officer who was dressed in plain clothes consisting of jeans, a hooded sweatshirt, and a baseball cap.

The interviewers sat across the table from Defendant.  They spoke to Defendant in a casual tone. Neither interviewer is apparently armed. Defendant was unrestrained throughout the interview.  At the commencement of the interview, Defendant was read a

*Miranda* warning.  Defendant indicated orally that he understood the rights articulated in the warning and that he wished to speak with the officers. Defendant inquired as to why he was not read his *Miranda* rights at the time he was arrested.  The officers asked him if he had been previously asked questions and Defendant indicated that he was not asked anything.   Thereafter,  the officers took turns asking Defendant questions. Defendant answered the questions presented to him in a cooperative manner.  Defendant appeared to be relaxed:  His posture was casual; he spoke in a conversational tone; and his voice was clear.

At approximately 19 minutes into the interview Defendant told the officers, that everyone who was accusing him of armed robbery could prepare their cases, meet him at trial, and they could "call him a lawyer, or whatever" because he did not commit any armed robberies.  The officers then told Defendant that he had been identified as having committed an offense.  Thereafter, Defendant stated that he had nothing to talk about and further stated that the officers might as well call his mother so that she can call his attorney.   Defendant then reiterated that he had nothing to say to the officers.   The officers asked Defendant affirmatively if he wanted to talk to an attorney.  Defendant said that he did and Defendant said, "I have nothing further to say.   You can stop this interview now."  The officers then said that they had an obligation to clarify the attorney statement and they had the obligation to stop if that was Defendant's request. Defendant stated, "Yeah. I'm done." Defendant explained that anything he said could not help him

and stated, "So I'm ready to stop talking."[1]  Detective Owens stated that he would not ask Defendant any more questions, but Detective Owens also stated that he disagreed with Defendant's view that anything he might say could not help him.   Detective Owens explained that it was their intent to present Defendant with the "solid" case that they had against him, solicit his admission to that offense, and solicit his help in clearing up other cases.  The officers then informed him that he would need to reinitiate any further discussions.

### b.  November 2, 2011 Interview

Government Exhibit 6 is a CD containing an audio-recorded interview with Defendant from November 2, 2011.  The officer making the recording stated that the interview was conducted at the Hennepin County jail at approximately 1:00 p.m.  The interview is approximately 16 minutes in length.  The contents can be briefly summarized as follows:

The officer identified himself as working for the Roseville Police Department. The officer stated that he knew that investigators spoke with Defendant previously and that the officer was not there to "talk about their case or anything like that."  The officer read Defendant his *Miranda* rights and asked, "Have you been read that before?"  Then,

---

[1]  At the end of this sentence, Defendant's voice trails off and it is difficult to discern. It seems that he completes his sentence by stating, "[S]o I'm ready to stop talking *and then go*." This Court does not make an affirmative finding that is what was said, but even if this Court found that he ended his sentence by indicating that he was ready to go, such an expression of intent would be cumulative of an earlier unambiguous expression of intent to exercise his right to remain silent.

after a pause, the officer stated, "Okay. Do you have any questions about that?" Defendant replied, "I don't know what you [are] here for."

The officer asked Defendant questions about the October 7, 2011 robbery and the officer told Defendant that he knew Defendant was involved.  Defendant stated that the officer could send him back to his room and charge him.  After a few moments of discussion, Defendant stated: "There ain't no sense sitting here then. I gotta go." Defendant's voice becomes farther from the microphone.   Thereafter, the officer stated, "Sit down for a second. Don't just jump up like that." Defendant replied, "I'm just going to go back to my room and lie down." (Defendant later stated, "I was going to walk out the door. You asked me to stop.  I'm on my way to my room.") Defendant also stated something about "his lawyer" that is not decipherable on the recording. Thereafter, the officer instructed Defendant to only listen and instructed Defendant to provide his attorney with the officer's business card.

### 3.  Searches and Seizures

#### a.  October 17, 2011 Traffic Stop

Patrol Officer Steven Thomas, with the Plymouth Police Department, testified that on October 17, 2011, at the hours close to midnight, he witnessed a van weaving in and out of its lane.  Tr. 89:11-90:18.  "The vehicle was weaving, coming down Xenium Lane to Highway 55, it weaved in and out of its lane twice and made a right-hand turn on to Highway 55. It went over the dotted line in the road." Tr. 93:3-10. Officer Thomas testified the van was gold in color and had "chrome mag wheels." Tr. 90:15-19. The van matched the description that was given out by the Minnetonka Police Department "in an

[attempt-to-locate announcement] for an armed robbery with a gun." Tr. 90:19-21; 91:9-11. The attempt to locate included a color surveillance photograph of the van. Tr. 104:11-20; 94:24-92:2. Officer Thomas believed the attempt-to-locate announcement went out on October 11, 2011. Tr. 91:12-14.  Officer Thomas testified that he conducted a traffic stop. Tr. 92:3-10.

Officer Thomas testified that after stopping the van he approached the van on foot. Tr. 94:3-21. The van contained a female passenger and a male driver, who was identified at the scene and during the hearing as Defendant. Tr. 94:3-21. When Officer Thomas approached the vehicle he could "smell an odor of marijuana, fresh marijuana coming from the vehicle." Tr. 94:8-9. Officer Thomas asked Defendant to exit the van and walk to the rear of the vehicle. Tr. 95:1-6.  Officer Thomas then performed a pat down search of Defendant. Tr. 95:7-11.  During the pat down search the Officer recovered a straw containing a white powdery substance, which Officer Thomas believed to be used to sniff or snort cocaine. Tr. 98:20-99:4.  Defendant produced his driver's license and proof of insurance as asked. Tr. 94:11-14.  Defendant reported to Officer Thomas that he recently purchased the van on October 8, 2011. Tr. 95:12-23.  Officer Thomas told Defendant that he had been pulled over for weaving in and out of his lane, and Defendant stated that he had "a bad wheel" on the van. Tr. 97:6-10.

Officer Thomas also searched the van after the passenger reported that she and Defendant had been smoking marijuana in the van. Tr. 97:25-98:4. Officer Thomas found an "old joint of marijuana in the ashtray," a small amount of marijuana in the passenger's purse, and a hidden compartment containing empty plastic baggies.  Tr. 98:3-16.

Another officer at the scene learned that the insurance on the van was not current. Tr. 99:7-14. Therefore, the officer impounded the van in accordance with Plymouth Police Department procedures. Tr. 99:13-17.

### b.  October 19, 2011 Search and Seizure

Officer Ryan Matthew of the Golden Valley Police Department testified that as part of the Hennepin County Violent Offender Task Force he investigated a series of robberies that occurred in September and October 2011. Tr. 106:1-25.  Officer Matthew had reason to believe the robberies were connected because the description by each of the victims was very similar; "they described [the robber] as a black male, five-eight to five-ten, medium build anywhere from 150 to 170 pounds, always wore dark clothing, including a dark hoodie, and dark pants," and the robber had a tattoo on his neck. Tr. 107:1-16.

Defendant was identified as a suspect based upon surveillance video from a robbery that occurred at a tobacco store in Minnetonka. Tr. 109:12-19.  There was surveillance video of the suspect arriving and leaving in a tan Safari van with large wheels and a distinct rust pattern on the back left door. Tr. 109:12-19. The surveillance video showed a black male wearing dark clothing, a hooded sweatshirt and dark pants exiting the vehicle. Tr. 109:20-110:5.

Following the October 17, 2011 stop and impounding of Defendant's van by the Plymouth Police Department, other officers with the task force conducted surveillance on Defendant when he came to pick up his van from the Plymouth impound lot on October 19, 2011. Tr. 111:9-20. Defendant arrived at the impound lot with his girlfriend, A.S. Tr.

17

111:21-24. They arrived together in a red Mitsubishi Galant. Tr. 112:1-2. Defendant

then left in his Safari van and drove to a specific residence on Queen Avenue North. Tr.

112:10-13. Officers followed Defendant from the impound lot to this location, and while

they were observing Defendant at the Queen Avenue North location, Officer Matthew

was notified by Detective Arons that the victim in the Way To Go Sports robbery

identified Defendant as the suspect in that robbery. Tr. 112:14-113:18. Based upon the

identification, Defendant was arrested while at the Queen Avenue location. Tr. 113:19-

114:3.

Thereafter, Officer Matthew and other officers obtained consent to search the

residence from L.M., the renter of the specific residence on Queen Avenue North. Tr.

114:4-17; Tr. 115:12-13. The renter identified herself as Defendant's aunt and she

provided both verbal and written consent. Tr. 114:4-17. The written consent form was

submitted to the Court as Government Exhibit 2. L.M. reported that Defendant had

stayed at the residence for "a couple of days." Tr. 115:14-18. Officer Matthew spoke

with L.M., another person who identified himself as Defendant's cousin, and L.M.'s

boyfriend. Tr. 115:23-116:4. They identified a room where Defendant "had all of his

personal belongings." Tr. 116:5-9. Officer Matthew testified that the personal belongs

consisted of white garbage bags containing his personal clothing. Tr. 116:5-9. They

directed Officer Matthew to take Defendant's personal belongs because "[t]hey didn't

want anything to do with them. Tr. 116:11-16. Government Exhibit 2 also contains a

receipt, inventory and return that states that Officer Matthew took into custody: (1) mail

in the name of Defendant; (2) plastic bag containing 58 bags of marijuana; (3) black

hooded sweatshirt and underwear; and (4) "4 misc[ellaneous] bags of clothing." Gov't Ex. 2.

### c.  October 19, 2011 Warrant I

Government Exhibit 1 is an application for search warrant and supporting affidavit, search warrant, and receipt, inventory, and return. On October 19, 2011, Detective Arons presented an application for search warrant and supporting affidavit to a Hennepin County District Court Judge. The identified items to be searched for included: (1) a silver colored semi-automatic handgun, (2) a black smart-phone, and (3) items demonstrating constructive possession.  The vehicle to be searched was a 1998 GMC Safari van with a specific license plate number.  The facts tending to establish grounds for the issuance of the search warrant included as follows: Officers were investigating a series of robberies where the suspect brandished a silver colored semi-automatic handgun.  Defendant was identified as the suspect.  Officers searched the residence of an associate of the suspect and found clothing that matched the clothing worn by the suspect in two robberies. Defendant had stayed at the residence within 24-hours preceding the search.  An individual present during the search reported hearing Defendant describe that he hid a gun under a seat in his van, a GMC Safari van with a specific license plate number, and Defendant was observed driving the van on that date.  Finally, a black smartphone was in plain view on the van console and victims observed the suspect talking on a black smartphone.  District Court Judge DuFresne signed the search warrant on October 19, 2011.  Officers performed the search on October 19 and recovered a black

cellular phone, a small plastic baggy containing a white powdery substance, and documents signed by Defendant.

### d. October 19, 2011 Warrant II

Government Exhibit 4 is an application for search warrant and supporting affidavit, search warrant, and receipt, inventory, and return. On October 19, 2011, Detective Arons presented an application for search warrant and supporting affidavit to a Hennepin County District Court Judge. The identified items to be searched for included: (1) a silver colored semi-automatic handgun, (2) a black hoodie, (3) a black skull cap, (4) dark colored tennis shoes with white bottoms, (5) a smartphone that was possibly dark or red, and (6) items demonstrating constructive possession. The place to be searched was a specifically identified apartment in Brooklyn Center and a 2009 "Mits Galant," with a specified license plate number.

The facts tending to establish grounds for the issuance of the search warrant included as follows: Officers were investigating a series of robberies where the suspect brandished a silver colored semi-automatic handgun. One robbery occurred on September 26, 2011. The victim in that robbery identified Defendant as the suspect and described him wearing a black hoodie, a skull cap, and black shoes with white bottoms. The victim also stated that he had a smartphone. On October 17, 2011, officers observed Defendant with his girlfriend together in a Mitsubishi Galant with a specified license plate number. The officers were told that Defendant was staying with his girlfriend and kept possessions at her house. The District Court Judge signed the search warrant on October 19, 2011. Officers performed the search on October 19 and recovered four

cellular telephones, two black hoodies, papers with Defendant's name, and black shoes with a white soles.

### e.  October 26, 2011 Warrant

Government Exhibit 3 is an application for search warrant and supporting affidavit, search warrant, and receipt, inventory, and return. On October 26, 2011, Officer Matthew presented an application for search warrant and supporting affidavit to a Hennepin County District Court Judge.  The identified information to be searched for included "[a]ny and all names, phone numbers, codes, messages, file ledgers, images, e-mails or any other electronic information stored within the electronic equipment." The cellular phones to be search included a Pink Sanyo cellular telephone, a Silver Verizon Motorola cellular telephone, and two Black T-Mobile My Touch cellular telephones. Each phone has a unique serial number.

The facts tending to establish grounds for the issuance of the search warrant included as follows:  The victim-witness in the Way To Go Sports robbery observed the suspect talking and texting on a black cellular phone. Defendant was identified as the suspect. The cellular phones were recovered in another search in relation to this investigation.

[Continued on next page.]

## III.

Based upon the foregoing Findings, the undersigned Magistrate Judge makes the following:

## CONCLUSIONS OF LAW

**1. Defendant's Motion to Suppress Eyewitness Identifications (Docket Nos. 24, 37)**

Defendant moves to suppress seven eyewitness identifications conducted between October 14 and November 16, 2011, arguing (1) the lineups were so unnecessarily suggestive depriving the defendant of due process of law, and (2) the identifications of Defendant by witnesses were the product of the unnecessarily suggestive lineup. This Court recommends that that Defendant's motion be denied.

An out-of-court identification procedure violates the Fifth Amendment's due process guarantees when it is "unnecessarily suggestive and conducive to irreparable mistaken identification." *Stovall v. Denno*, 388 U.S. 293, 302 (1967). Due process is not violated unless there is a substantial likelihood that the suggestive confrontation procedure would result in a misidentification. *Neil v. Biggers*, 409 U.S. 188, 198. Identification is valid notwithstanding a suggestive procedure if the totality of circumstances shows that the identification was reliable. *Manson v. Brathwaite*, 432 U.S. 98, 106 (1977).

Courts employ a two-prong test to determine whether an out-of-court identification procedure violates due process. *United States v. Johnson*, 56 F.3d 947, 954 (8th Cir. 1995). First, the court must determine whether the identification procedure was

unnecessarily suggestive. *Id.* If it was, then the procedure violates due process if the suggestive procedures created "a very substantial likelihood of irreparable misidentification. *Id.* (quoting *Manson*, 432 U.S. at 116).

In *Biggers*, the Supreme Court identified factors for determining whether a suggestive identification procedure caused a substantial likelihood of misidentification: (1) the opportunity of the witness to view the criminal at the time of the crime, (2) the witness' degree of attention, (3) the accuracy of the witness' prior description of the criminal, (4) the level of certainty demonstrated by the witness at the confrontation, and (5) the length of time between the crime and the confrontation. 409 U.S. at 199-200; *see, e.g.*, *United States v. Gipson*, 383 F.3d 689, 698 (8th Cir. 2004); *United States v. Murdock*, 928 F.2d 293, 297 (8th Cir. 1991). Other factors pertinent to the reliability of the identification may be considered. *See, e.g.*, *United States v. Rogers*, 73 F.3d 774, 778 (8th Cir. 1996) (finding identification reliable because two other witnesses identified defendant).

Defendant identifies the following photo lineups that were conducted: (1) "November 16, 2011 with witness B.S."; (2) "October 28, 2011 conducted by Brooklyn Park Police Det. Ryan"; (3) "October 17 and 28, 2011 with witness S.G."; (4) "October 18, 2011 with witness A.O."; (5) "October 27, 2011 with witness B."; (6) "October 27, 2011 with witness D.E."; and (6) "October 14, 2011 with witness N.T."[2]   Defendant's

---

[2] There are inconsistencies between Defendant's headings and the testimony and the exhibits. Therefore, this Court has organized its analysis according to the identifications for which testimony and exhibits were offered.

arguments are primarily limited to the issue of whether the photographs used in each sequential photo lineup (i.e., the exhibits) were unduly suggestive.

### a.    Government Exhibit 7

Government Exhibit 7 was used as the sequential photo lineup on October 26, 2011.  Defendant challenges this lineup on three grounds: First, Defendant contends that the photo lineup did not include all of the relevant features because it did not include individuals with neck tattoos.  Second, Defendant contends that the lineup "is remarkably inconsistent from photo to photo." Defendant specifically identifies an individual has scars on his face. Third, Defendant contends that the absence of the tan folders renders the record insufficient for this Court to consider whether the lineup was unduly suggestive.

This Court does not conclude that the array in Government Exhibit 7 was unduly suggestive.  Government Exhibit 7 consists of six pictures of black men appearing to be of a similar age with relatively short hair and medium build.  Some of the individuals have close shaven goatee facial hair while others are clean shaven. Importantly, there is no difference that tends to isolate Defendant.  No neck tattoo is discernible on the photograph of Defendant.  By contrast, one of the other individuals appears to have either scarring or a tattoo on his neck.  Neither these neck marks nor the scars on the one individual's face are unduly suggestive because the matching of physical characteristics only needs to approximate. *See United States v. Triplett*, 104 F.3d 1074, 1080 (8th Cir. 1997) (holding that a lineup was not impermissibly suggestive where "[a]ll the persons depicted were African–American males of approximately the same age, complexion,

weight, and physical characteristics"); *Reynolds v. Lockhart*, 470 F.2d 161, 162 (8th Cir. 1972) (holding that a lineup was not impermissibly suggestive where "there were seven men of varying description in the line-up, at least one of whom resembled the appellant in age and appearance").

The absence of the tan folders from the record does create the inference that the October 26, 2011, lineup was unduly suggestive. Investigator Reilly testified that the six folders were identical tan folders, which he numbers one through six. Tr. 20:2-7. The use of the tan folders minimized the likelihood that Investigator Reilly would inadvertently influence the victim-witness's view. This Court finds the testimony to be credible and finds no error in not preserving the tan folders and in not offering the tan folders into evidence.

### b.   Government Exhibits 8 and 10

Government Exhibits 8 and 10 are identical and were used as the sequential photo lineups on October 27, October 28, and November 16, 2011. Officer Gray administered the lineup on October 27. Officer Hall administered the sequential photo lineups on October 28 and November 16.

Defendant challenges these lineups, arguing that they are unduly suggestive because Defendant is the only individual in the photographs who is wearing an orange shirt. In support of Defendant's argument Defendant cites *United States v. Granados*, wherein the Eighth Circuit Court of Appeals stated that "the lineup may have been suggestive if *only* [the defendant] had facial hair, or *only* [the defendant] had no facial hair." 596 F.3d 970, 974 (8th Cir. 2010) (emphasis added); *see also United States v.*

*Johnson*, 56 F.3d 947, 954 (8th Cir. 1995) (assuming *arguendo* that a lineup was inherently suggestive where the defendant was the only individual wearing a jail uniform).

The Government makes two arguments in response.  First, the Government contends that Defendant's orange shirt is not unduly suggestive because there was an array of different colored shirts in Exhibits 8 and 10. Second, the Government contends that to highlight Defendant's clothing misconstrues the appropriate inquiry for the court, which is to ask not whether defendant has a suggestive, distinctive feature at all, but whether that suggestive, distinctive feature is relevant to the description provided by the witness.

This Court concludes that Exhibits 8 and 10 are not unduly suggestive. When a court considers differences in appearance tending to isolate a defendant, the most significant features are those that have been identified by the witness prior to the photo lineup. *See Arroyo v. Conway*, 08-CV-03887 DLI, 2010 WL 3950734 (E.D.N.Y. Oct. 7, 2010) (stating "the focus of the inquiry is not whether the suspect has a distinctive feature not shared by the other participants, but whether that feature matches the description provided by the witness").  Nevertheless, this Court does not read the case law to support a bright-line rule that only those features that are relevant to the witness are material when considering the disproportionality of photographs.  Likewise, the fact that there were multiple colors of shirts is also not solely determinative.  Rather, this fact mitigates the suggestiveness that is inherent in the Defendant wearing a unique color shirt. All of the photographs are of black males of medium build with closely trimmed hair, dark or

brown eyes, and close shaven goatee facial hair. In light of all of these similar characteristics, this Court concludes that Defendant's wearing an orange shirt was not unduly suggestive. *Cf. United States v. Ramsey*, 999 F.2d 348, 350 (8th Cir. 1993) (holding that lineup was not unduly suggestive where the defendant was the only individual asked to "remove visible clothing from beneath the cover clothing" and with shoelaces in his shoes).

Defendant argues that there is an insufficient record to support that the November 16, 2011 lineup procedure was proper because the officer who conducted the lineup and testified was not the same as the officer who called the customer-witness to the police department. Defendant speculates that the call may have contained information that rendered the lineup unduly suggestive. Officer Hall testified that the customer-witness was provided with an extensive instruction prior to reviewing the photographs. This instruction would have obviated any of Defendant's speculative concerns.  Thus, in absence of any evidence to the contrary, this Court finds no error in the procedure used on November 16, 2011.

### c.    Government Exhibit 9

Government Exhibit 9 was used as the sequential photo lineups on October 19, 2011. Defendant challenges these lineups, arguing that they were unduly suggestive because in the photographs Defendant is wearing a prison issued shirt and none of the individuals in the photographs have neck tattoos. This Court concludes that Government Exhibit 9 is not unduly suggestive.  Government Exhibit 9 contains six photographs of black males who all have generally short hair, dark eyes, and close-shaven goatee facial

27

hair.  Other individuals in the photo lineup are wearing the same prison-issued blue shirts.

Moreover, there is no difference that tends to isolate Defendant.  Furthermore, there was

no testimony that the Department of Corrections photographs could be filtered based

upon tattoos.

### d.    Government Exhibits 11A, 11B, and 11C

Government Exhibits 11A, 11B, and 11C are all surveillance photographs from

2nd Wind[3] that were shown to A.S., Defendant's girlfriend.  Defendant moves to

suppress A.S.'s identification of Defendant from these photographs, arguing it was

unduly suggestive because A.S. was previously told that Defendant was the target of a

robbery investigation.  This Court concludes that the procedure in the present case was

not unduly suggestive.  As the Eighth Circuit Court of Appeals has explained,

> When an eyewitness is shown an improper lineup or photo
> array, undue suggestiveness may be prejudicial because the
> suggestiveness may cause the eyewitness to falsely recollect
> the face of the person who committed the offense. In contrast,
> when someone already familiar with a suspect is asked to
> comment on whether a[n] . . . image portrays the suspect,
> these concerns are absent. In general, a girlfriend, relative, or
> other acquaintance is better equipped than a juror to
> determine if an image on a tape is, in fact, the image of the
> known person.

*United States v. Dobbs*, 449 F.3d 904, 910 (8th Cir. 2006).  This is true even when the

acquaintance-witness is informed by investigators that the known person is the suspect.

*Id.* at 909.

---

[3]  While Defendant identifies these photographs as being from "Way to Go
Sports," they are actually photographs labeled as being from "2nd Wind."

### e. Substantial Likelihood of Misidentification

Assuming *arguendo* that the photo lineups that utilized Exhibits 7, 8, 9, 10, 10A, 10B, 11A, 11B, and 11C, were unduly suggestive, based on the totality of circumstances, there is not a substantial likelihood of misidentification from any of these lineups.

First, the procedure used to present the photo lineups to the victim-witnesses in the present case are substantially similar to the procedure affirmed in *United States v. Triplett,* 104 F.3d 1074, 1080 (8th Cir. 1997). Moreover, there is nothing in the record to suggest that any of the victim-witnesses knew that the individuals in the photographs were in custody or a suspect. *United States v. Johnson*, 56 F.3d 947, 954 (8th Cir. 1995). Recording a witness' identification is not required.

Second, for all of the sequential photo lineups in the present case, the record supports that the victim-witnesses had a clear view of the perpetrator during the offense. In most instances the witnesses interacted with the suspect for some minutes before the robbery commenced. *See, e.g., Harris v. Wyrick*, 644 F.2d 710, 712 (8th Cir.1981) (witness saw perpetrator for one to two minutes in a well-lit room).

Third, the witnesses all provided descriptions that were substantially consistent with the photo lineups presented to them.

Fourth, the witnesses all demonstrated a sufficient level of certainty in their identifications. The fact that Victim-Clerk I identified someone previously does not create a substantial likelihood of misidentification because Victim-Clerk I was not "100 percent sure" on his previous identification, Tr. 124:10-127:1, and on October 19, 2011, Victim-Clerk I immediately identified Defendant and stated that he was certain of his

identification.  Moreover, the physical reactions of several witnesses upon seeing a photograph of Defendant support the reliability of the victim-witnesses' identifications of Defendant.

Finally, there is no reason to believe that the weeks between the robberies and viewing of the photo lineups would diminish the witness' ability to identify the perpetrator. *See United States v. Mart*in, 391 F.3d 949, 953 (8th Cir. 2004) (holding "[t]here is no reason to believe that the four months between the robbery and their viewing of the second spread would diminish their ability to identify a man who had violently attempted to rob them").

Thus, for all of these reasons, the Court concludes that based on the totality of circumstances there was not a substantial likelihood of irreparable misidentification.

## 2. Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure (Docket Nos. 19, 38)

Defendant moves to suppress any physical evidence obtained as a result of searches and seizure of the GMC Safari van, the GPS tracking device, the residence at Queen Avenue, cellular telephones, and the residence at 69th Avenue. Defendant argues (1) the warrants were issued without a sufficient showing a probable cause; (2) the searches and seizures conducted without a warrant were done so without probable cause; (3) there was not free and voluntary consent to search the Queen Avenue residence; and (4) the seizure of the GMC Safari van was the result of an unlawful arrest. This Court recommends that that Defendant's motion be granted in part and denied in part.

### a.  Standing

Defendant moves to suppress evidence obtained as a result of the search of the residence at 69th Avenue and cellular telephones.  The Government opposes the motion, arguing that Defendant lacks standing to challenge the search of the residence at 69th Avenue and Defendant only has standing to challenge the search and seizure of his own cellular telephone.

"Fourth Amendment rights are personal rights which . . . may not be vicariously asserted." *Alderman v. United States*, 394 U.S. 165, 174, 89 S. Ct. 961, 966-67 (1969). "[C]apacity to claim the protection of the Fourth Amendment depends not upon a property right in the invaded place but upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place." *Rakas v. Illinois*, 439 U.S. 128, 143, 99 S. Ct. 421, 430 (1978).

Defendant has failed to demonstrate that he had an expectation of privacy at the residence at 69th Avenue.  Defendant "does not contend that he lived at this address or that he was a guest in the home at the time of the search." *United States v. Davis*, 103 F.3d 660, 671 (8th Cir. 1996).  The apartment searched was the residence of A.S., who told officers that Defendant was "kicked out." Absent a legitimate expectation of privacy in A.S.'s apartment, Defendant lacks standing to contest the search at 69th Avenue.

Likewise, Defendant presented no evidence to support that he had a reasonable expectation of privacy to have standing to contest the seizure of three cellular telephones from A.S.'s apartment or standing to challenge the search of those cellular telephones.  In

contrast, it is undisputed that Defendant has standing to challenge the search and seizure of the cellular telephone seized from his van.

### b. October 17, 2011 Stop

"It is well established that a traffic violation—however minor—creates probable cause to stop the driver of a vehicle." *United States v. Fuse*, 391 F.3d 924, 927 (8th Cir. 2004) (quotation omitted). "This is true even if a valid traffic stop is a pretext for other investigation." *United States v. Sallis*, 507 F.3d 646, 649 (8th Cir. 2007) (quotation omitted). "When an officer makes a routine traffic stop, 'the officer is entitled to conduct an investigation reasonably related in scope to the circumstances that initially' justified the interference." *Fuse*, 391 F.3d at 927. A reasonable investigation can include asking the driver for his license, registration, and proof of insurance. *United States v. Winters*, 221 F.3d 1039, 1041 (8th Cir. 2000).

The vehicle stop by Officer Thomas was based upon reasonable suspicion of a violation of Minn. Stat. § 169.18, subd. 7(a), i.e., failing to drive "as nearly as practicable entirely within a single lane." Asking Defendant for insurance information and checking insurance status of the van were part of a reasonable investigation.

Following the stop, while another officer was confirming the insurance status of the van, Officer Thomas conducted a pat or frisk search of Defendant. The United States Supreme Court has stated that, following a traffic stop, a "police officer must be positioned to act instantly on reasonable suspicion that the persons temporarily detained are armed and dangerous." *Arizona v. Johnson*, 555 U.S. 323, 330, 129 S. Ct. 781, 786 (2009). In the present case, Officer Thomas observed that Defendant's van matched a

written description and color surveillance photograph of a gold colored van with "chrome mag wheels" that was believed to be connected with an armed robbery.  Officer Thomas also smelled marijuana in the van.  Based upon this information, Officer Thomas had a reasonable and articulable basis to believe that Defendant may have a weapon and be dangerous.  *See United States v. Aldridge*, 719 F.2d 368, 372 (11th Cir. 1983) (holding that the officer had reasonable basis to conduct a pat search of driver where officer had reasonable basis to believe the vehicle contained individuals who may be involved in criminal activity).

The search of Defendant's van was justified based upon the smell of raw marijuana and the passenger's statement concerning smoking marijuana in the van. *See United States v. Winters*, 221 F.3d 1039, 1042 (8th Cir. 2000) (holding that the smell of raw marijuana created probable cause to search the car and its containers for drugs).

The Government contends the search of the van was also justified because any items found during Officer Thomas's search would have been found inevitably during an inventory search.  There is testimony in the record to support that it was police procedure to impound vehicles found to be uninsured, *see* Tr. 99:13-100:15, but there was no testimony or evidence concerning the inventory search procedures employed by Officer Thomas's department. "A warrantless inventory search must be done pursuant to 'standard police procedures' and for the purpose of 'protecting the car and its contents.'" *United States v. Best*, 135 F.3d 1223, 1225 (8th Cir. 1998) (quoting *South Dakota v. Opperman*, 428 U.S. 364, 372-73, 96 S. Ct. 3092, 3098-99 (1976)); *see also United States v. Wilson*, 636 F.2d 1161, 1163 (8th Cir. 1980) ("A legitimate seizure, however,

33

does not automatically justify an unlimited search of the automobile.").   Absent any record before this Court on the inventory search procedures, this Court cannot, for example, assess whether searching under the headliner would have exceeded the scope of the inventory search.  *Cf. United States v. Best*, 135 F.3d 1223, 1225 (8th Cir. 1998) (holding that searching inside door panels exceeds the permissible scope of any inventory search).  Therefore, this Court declines to conclude that the inevitability of the inventory search renders the search of the van reasonable under the Fourth Amendment.

### c.  Tracking Device

The United States Supreme Court recently held that the installation of a GPS tracking device on a vehicle and its use to monitor movements constitutes a search. *United States v. Jones*, __ U.S. __, __, 132 S. Ct. 945, 949 (2012).  There is no record before the Court to support that a tracking device was used in the present case.

### d.  Consent Search

"The Fourth Amendment's general prohibition against warrantless searches does not apply when officers obtain voluntary consent from the person whose property is searched or from a third party with common authority over the property."  *United States v. Esparza*, 162 F.3d 978, 980 (8th Cir.1998). The search of the Queen Avenue North address was based upon the voluntary consent of L.M.  L.M. was the renter of the Queen Avenue North address where Defendant had been staying as a guest.  L.M. provided both verbal and written consent to search the residence, garages and storage units. L.M. and others also directed the officers to the room in which Defendant's possessions were located. *Maxwell v. Stephens*, 348 F.2d 325, 336 (8th Cir. 1965).

Nevertheless, the record is devoid of information about how the Government discovered the contents of "4 misc[ellaneous] bags of clothing." The four bags were specifically identified by L.M. and others as *belonging* to Defendant and they were found in a room identified as containing Defendant's items. Based upon these statements, the officers could not reasonably assume that L.M. had authority to consent to the opening of the four bags. *See United States v. Moran*, 214 F.3d 950, 951-52 (8th Cir. 2000) *and United States v. Chap*man, 902 F.2d 1331, 1333 (8th Cir. 1990) (distinguishing between consent to search a place and consent to search containers found within the place). "The government bears the burden of establishing that an exception to the warrant requirement applies." *United States v. Williams*, 616 F.3d 760, 765 (8th Cir. 2010) (citing *Coolidge v. New Hampshire*, 403 U.S. 443, 455, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971)), *cert. denied*, 131 S. Ct. 1548, 179 L. Ed. 2d 310 (U.S. 2011). The Government did not meet its burden as to the "4 misc[ellaneous] bags of clothing." Therefore, this Court recommends that the "4 misc[ellaneous] bags of clothing" be suppressed.

### e. Search Warrants

"To be valid under the Fourth Amendment, a search warrant must be supported by a showing of probable cause." *United States v. Summage*, 481 F.3d 1075, 1077 (8th Cir. 2007). The Court considers "the totality of the circumstances to determine whether an [supporting] affidavit is sufficient to demonstrate probable cause." *United States v. Keele*, 589 F.3d 940, 943 (8th Cir. 2009). "Probable cause exists if the warrant application and affidavit describe circumstances showing a fair probability that contraband or evidence of a crime will be found in a particular place . . . ." *United States*

*v. Montes–Medina*, 570 F.3d 1052, 1059 (8th Cir. 2009). In the present case, the three warrant applications sufficiently recite facts to demonstrate probable cause that a crime was committed by Defendant and evidence of the crime can be found at the location to be searched. The three warrants describe with particularity the place to be searched and the items to be seized, and the nexus between the place, the items and offense. Even if the search warrants were not supported by probable cause, they were not so lacking in indicia of probable cause that it was unreasonable for the executing officers to rely on the warrants.

### 3. Defendant's Motion to Suppress Statements, Admissions, and Answers (Docket Nos. 20, 39)

Defendant moves to suppress the statements made by him on October 19 and November 2, 2011, arguing (1) the statements violated defendant's right to counsel under the Fifth and Sixth Amendments of the Constitution of the United States; (2) the statements were not given freely and voluntarily in violation of the Fourth and Fifth Amendments to the Constitution of the United States; and (3) the arrest of Defendant was not supported by probable cause or exigent circumstances. This Court recommends that that Defendant's motion be granted in part and denied in part.

#### a. Statements

Prior to questioning a suspect within the context of a custodial interrogation, "a suspect must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *J.D.B. v. North Carolina*, __ U.S. __, __, 131 S.

Ct. 2394, 2401 (2011) (quotation omitted); *Miranda v. Arizona*, 384 U.S. 436, 444-445, 86 S. Ct. 1602, 1612 (1966). The "voluntariness" of the questioning "is a legal question requiring independent federal determination." *Miller v. Fenton*, 474 U.S. 104, 110, 106 S. Ct. 445, 449 (1985). "'The test for determining the voluntariness of a confession is whether, in light of the totality of the circumstances, pressures exerted upon the suspect have overborne his will.'" *United States v. Aldridge*, 664 F.3d 705, 711 (8th Cir. 2011) (quoting *United States v. Carlson*, 613 F.3d 813, 817 (8th Cir.2010)).

Based on the totality of the circumstances, this Court concludes as follows: Defendant's October 19, 2011 statement was made within the context of a custodial interrogation; Defendant was apprised of his rights pursuant to *Miranda*; and Defendant waived his rights voluntarily, knowingly, and intelligently. This Court, however, also concludes based upon the totality of circumstances that during the interrogation Defendant unambiguously invoked his right to remain silent and unambiguously asserted his right to counsel. *Berghuis v. Thompkins*, __ U.S. __, __, 130 S. Ct. 2250, 2260 (2010). Based upon the totality of circumstances, Defendant unambiguously invoked his right to counsel when after the officers told Defendant that he had been identified as having committed an offense, Defendant stated that he had nothing to talk about and further stated that the officer might as well call his mother so that she can call his attorney. Even if these statements were not unambiguous enough, Defendant undoubtedly invoked his right to counsel when he affirmatively responded to the officer's question whether Defendant wanted to speak with counsel. Defendant stated: "I have nothing further to say. You can stop this interview now." Therefore, this Court

recommends that all statements by Defendant made on October 19, 2011, after the point indicated in this paragraph.

On November 2, 2011, two weeks had elapsed since the October 19 interview, a fresh *Miranda* warning was provided to Defendant. The purpose of the second interrogation was restricted to a different subject matter than the October 19 interview; nevertheless, this Court recommends that Defendant's statements from November 2, 2011, be suppressed because Defendant asserted his right to counsel on October 19, 2011. *See Arizona v. Roberson*, 486 U.S. 675, 687, 108 S. Ct. 2093, 2101 (1988) ("Whether a contemplated re-interrogation concerns the same or a different offense, or whether the same or different law enforcement authorities are involved in the second investigation, the same need to determine whether the suspect has requested counsel exists.").  There is nothing in the statements from October 19 or November 2 to suggest that Defendant reinitiated contact with police.  Just the opposite: Defendant stated that he did not know why he was being questioned on November 2, 2011. Moreover, there is nothing in the November 2 interrogation to suggest that Defendant knowingly and voluntarily waived his previously asserted right to counsel.  *Edwards v. Arizona*, 451 U.S. 477, 484, 101 S. Ct. 1880 (1981) ("[W]hen an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights.").

### b. October 19, 2011 Arrest

The constitutionality of a warrantless arrest "depends in turn upon whether, at the moment the arrest was made, the officers had probable cause to make it—whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense." *Beck v. State of Ohio*, 379 U.S. 89, 91, 85 S. Ct. 223, 225 (1964). Officer Ryan knew that there had been a robbery, *see* Minn. Stat. §§ 609.24-.245 (defining simple and aggravated robbery), at Way To Go Sports and that the victim-clerk identified Defendant in a photo lineup as the robber. This Court has already addressed the propriety of the photo lineup that occurred on October 19, 2011. Based upon this information, Officer Ryan had probable cause to arrest Defendant on October 19, 2011. *See United States v. Harris,* 956 F.2d 177, 180 (8th Cir. 1992) (holding that the witnesses' identification of the defendant as the gunman provided the officers with sufficient probable cause to believe that the defendant had committed the murder).

## IV.

Based upon the foregoing Findings and Conclusions, the undersigned Magistrate Judge makes the following:

## RECOMMENDATION

For the reasons set forth herein, **IT IS HEREBY RECOMMENDED** that:

1. Defendant's Motion to Suppress Eyewitness Identifications (Docket Nos. 24, 37) be **DENIED**.

2.  Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure (Docket Nos. 19, 38) be **GRANTED IN PART** and **DENIED IN PART** as follows:

    a.  The four miscellaneous white plastic bags and the articles of clothing contained therein, which were all seized from the Queen Avenue North address, be **SUPPRESSED**; and

    b.  Defendant's motion be denied in all other respects.

3.  Defendant's Motion to Suppress Statements, Admissions, and Answers (Docket Nos. 20, 39) be **GRANTED IN PART** and **DENIED IN PART** as follows:

    a.  All statements by Defendant made on October 19, 2011, after Defendant unambiguously invoked his right to counsel when after the officers told Defendant that he had been identified as having committed an offense, Defendant stated that he had nothing to talk about and further stated that the officer might as well call his mother so that she can call his attorney be **SUPPRESSED**;

    b.  All statements made on November 2, 2011 be **SUPPRESSED**; and

    c.  Defendant's motion be denied in all other respects.

Dated: <u>July 23, 2012</u>

<u>        *s/ Tony N. Leung*        </u>
Magistrate Judge Tony N. Leung
United States District Court
for the District of Minnesota

Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties, written objections which specifically identify the portions of the Report to which objections are made and the bases for each objection. This Report and Recommendation does not constitute an order or judgment from the District Court and it is therefore not

directly appealable to the Circuit Court of Appeals. Written objections must be filed with

the Court before **August 7, 2012**.